UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:13-CR-4-TLS |
| | ) | |
| JULIUS LAWSON, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Julius Lawson's Motion for New Trial Pursuant to Fed. R. Crim. P. 33 [ECF No. 83], filed on October 23, 2013, and Second Motion for New Trial Pursuant to Fed. R. Crim. P. 33 [ECF No. 95], filed on March 12, 2014. The Motions have been fully briefed. This Opinion and Order addresses both motions.

**BACKGROUND**

On December 19, 2012, at around 3:30 PM, two men entered the Diplomat Plaza Post Office located in Fort Wayne, Indiana, and attempted to rob items from inside the Post Office. An investigation led to the arrest of the Defendant as one of the perpetrators.

On January 23, 2013, the Government filed an Indictment [ECF No. 18] charging the Defendant with attempting to rob a person having custody of any mail matter, money, or property of the United States and aiding and abetting, in violation of 18 U.S.C. § 2114(a) and 18 U.S.C. § 2 (Count 1); use of a firearm during and in relation to a crime of violence and aiding and abetting, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2 (Count 2); and interference with the performance of the duties of an empoyee of the United States and aiding and abetting, in

violation of 18 U.S.C. § 111(a)(1) and and 18 U.S.C. § 2 (Count 3). The Court conducted a five-day jury trial, which began on May 14, 2013, and concluded on May 21 when the jury returned a verdict of guilty as to all three counts.

The jury heard testimony from witnesses who were inside the bank during the attempted robbery. Testimony from a customer revealed that one of the men held a gun on her while the other jumped over the counter to get behind the clerk stations. The Government presented evidence to support its theory that the Defendant was the counter jumper. A postal employee and window clerk, Cathy Weigold, observed the two subjects when they first entered the customer P.O. box lobby area through the front door. She locked eyes with the counter jumper. As he entered the customer lobby area where Weigold was working, she saw him pull a mask up from under his chin area, covering his mouth up to the bridge of his nose. Weigold ran into the manager's office, where she and two other employees barricaded themselves until police arrived. She continued to watch the events on a monitor located inside the office and called 911.

Dawn Hunter was the customer Weigold had just finished assisting with a postal transaction when the two men entered. She was the only customer in the post office at the time. One of the men stated "I have a gun" and pointed a gun at her midsection while standing within arm's reach. The Defendant joined his gun wielding accomplice as he stood with Hunter. The Defendant grabbed a few items from her purse, but did not keep anything. Hunter then saw the Defendant jump over the middle counter. She witnessed him jump back over and leave with his accomplice.

While watching the surveillance monitor from the Manager's office, Weigold observed the Defendant jump the middle counter, then stand in front of the partition located behind the

2

window clerk stations. He went both directions from the partition, including the side where the Manager's office is located. Behind the counter were items of value and cash.

Surveillance photos show the counter jumper placing his left hand on the counter as he vaulted over it.[1] Surveillance photos also show the unknown accomplice and Hunter watching the Defendant as he jumps over the counter and then back again before fleeing with his accomplice. Hunter remained crouched down on the floor and called 911, twice. During her second call, she relayed that a cell phone located on the counter was going off, and that it had not been there before. The cell phone would prove to be an important piece of evidence.

Police arrived and secured the scene. Investigators at the post office noticed the cell phone when it continued to ring. The call was from Violent Hanson's cell phone. Hanson is the Defendant's girlfriend and mother of his child. That same day, Postal Inspector Andrew Gottfried went to Hanson's residence. While there, he saw the Defendant and another man. On December 20, FWPD Detective Gary Morales conducted a forensic examination of the cell phone dropped on the counter and determined that the dialing number on the phone was 260-246-8662 with the IMSI number as 310260547716993. The name Violet with number 260-443-1880 was one of the contacts stored in the phone. The phone also contained photographs of an individual taking pictures of himself with the cell phone. The metadata information indicated that the pictures were taken on December 13, 14, 16 and 17, 2012. Inspector Gottfried later identified the individual in those photographs as the Defendant.

---

[1] The original surveillance time lapse VHS tape that had been placed in the recorder on the early morning of December 19, 2012, was removed that same evening by Postal Inspector Andrew Gottfried, who later sent it to the Postal Service Laboratory in Dulles, VA for analysis. Rogers Pace, Forensic Video Analyst with the United States Postal Service in Dulles, VA, converted the original VHS recording into processed digital video clips, digital still images and printed still images.

Susan Johnson, Custodian of Records for T-Mobile, also testified at the trial. She explained that the subscriber record information for the prepaid cell phone (recovered from the postal counter) was in the name of Julius Lawson with mobile number 260-246-8662 and IMSI number 310260547716993. The call detail records for the Defendant's phone for the month of December reflected numerous calls and text messages made to and received from Violet Hanson's cell phone number. The T-Mobile call detail records also reflected a call to the Diplomat Plaza Post Office.

FWPD Detective Joel Slygh testified that he conducted a forensic examination of Hanson's cell phone. The forensic examination report confirmed that the phone number associated with Hanson's phone was in fact 260-443-1880. Hanson's phone had also received text messages from the Defendant's cell phone number.

Detective Mark A. Rogers, a Detective with the City of Fort Wayne Police Department for more than eighteen years, testified regarding his role in the attempted robbery investigation. Rogers testified that he was assigned to the crime scene management division, where his duties involved collecting and preparing evidence for forensic examination. According to Rogers, he took photographs at the Post Office, including a picture of a cell phone located on the front, middle counter. The Defendant also collected the cell phone itself. Rogers testified that he dusted for fingerprints, and was able to lift several prints from the middle window counter of the Post Office, which he placed in a plastic evidence bag and sealed.

These prints were later analyzed by a Forensic Latent Print Analyst with the United States Postal Inspection Service, Norberto Rivera. Testifying as an expert, Rivera told the jury that the latent lifts were of sufficient quality to make several points of comparison with the

Defendant's known prints. He concluded that the prints were a match to the Defendant, specifically his left palm.

## DISCUSSION

Federal Rule of Criminal Procedure Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

### A.     Impeachment Evidence

On September 17, 2013, after allegations against Officer Mark Rogers were publicized, the Government made a request to the Fort Wayne Police Department for a review of Rogers's personnel file for pending and/or sustained findings of misconduct. Shortly thereafter, the Government provided the Defendant's counsel with copies of the information provided by the FWPD, which included the pending state charges that were filed against Rogers based on events that occurred after the Defendant's trial, as well as the disciplinary history of Rogers while serving on the FWPD. The record revealed that Rogers, who had worked in the Department since 1994, was counseled in 2004 for improper conduct, received a letter of reprimand in January 2005 for improper conduct, and received a letter of reprimand in December 2006 for being involved in a preventable accident with a police vehicle. According to the Government, it asked Officer Rogers during pre-trial preparation whether he had any disciplinary actions presently pending and/or sustained that went to his truthfulness. He indicated that he did not, and the Government had no reason to pursue the matter any further.

The Defendant argues that the Government violated his due process rights when it did not provide him with Rogers's FWPD disciplinary record. The Defendant asserts that he would have used the evidence to impeach Rogers, and that the impeachment, in reasonable probability, would have caused the jury to reach a different verdict.

Under *Brady v. Maryland*, the prosecution has an affirmative duty to disclose evidence that is both favorable to the defense and material to either guilt or punishment. *Kyles v. Whitley*, 514 U.S. 419, 432–34 (1995); *see also United States v. Bagley*, 473 U.S. 667, 674–75 (1985); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Impeachment evidence falls within the *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 154 (1972). When the defendant alleges that the government committed a *Brady* violation, he is entitled to a new trial if he can establish: "'(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial.'" *United States v. Gillaum*, 372 F.3d 848, 858 (7th Cir. 2004) (quoting *United States v. Silva,* 71 F.3d 667, 670 (7th Cir. 1995)).

"Information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *United States v. Dimas*, 3 F.3d 1015, 1018 (7th Cir. 1993). The Government disputes whether Rogers's disciplinary record can be considered impeaching and cites to admissibility problems under Federal Rules of Evidence 608(b) and 403. The Defendant counters that the Government is not the sole decider of whether a disciplinary action goes to Rogers's truthfulness. Alternatively, the Defendant argues that even if none of the incidents go to Rogers's character for truthfulness, his record would have been admissible to show his bias. Upon consideration of the parties' arguments and the trial record, the Court finds that a new trial is not

warranted because Rogers's disciplinary record was not material to an issue at trial and no prejudice ensued.

Even if favorable impeachment evidence is suppressed, it does not constitute a violation of *Brady* and a right to a new trial unless the suppressed evidence was material to an issue at trial. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999) (stating that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict"). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Smith v. Cain*, 132 S. Ct. 627, 630 (2012). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* A defendant must show the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

The Court has identified from the Defendant's submissions two ways he believes the evidence could have proven material. The first is to establish that Rogers's work at the crime scene was not reliable. According to the Defendant, impeaching Rogers with "his improper conduct and accident involving a police vehicle may have caused the jury to question his attention to detail and reliability of his techniques." (Motion for New Trial 4, ECF No. 83.) The Defendant goes on to argue that "[t]his, in turn, would have naturally led to questioning the reliability of the fingerprint that was lifted," *id.*, and that, had the fingerprints been questioned, "it is reasonable to believe that the jury would have acquitted him." *Id.* at 6. In the Defendant's Reply, he advances a second potential theory using the legal principle that evidence of a

7

witness's bias is always admissible. He submits that the disciplinary record shows that Rogers believed his career was in jeopardy, and argues that this fear of losing his employment biased him against the Defendant.

Rogers is a crime scene technician; he collected evidence at the post office, but had no part in analyzing it. The only testimony that Rogers offered that could be considered an explanation of his technique was that he used a brush to apply fingerprint powder to surfaces, which would make the oils left on the surfaces by a person's finger or hand visible to the naked eye. The only details he provided to the jury regarding the completion of his duties at the post office was to identify the areas he checked for prints and what he did with the print cards. Even if the disciplinary record could be introduced to suggest that Rogers did not pay attention to details because he had previously been involved in an avoidable accident, the jury still heard a fingerprint expert's extensive and detailed testimony confirming that two of the prints Rogers lifted were, in fact, suitable for comparison. Multiple evidentiary sources also verified that it was the middle counter where the counter jumper laid his palm. Inspector Gottfried testified that he sent the sealed bags with the lift cards to the fingerprint analyst. Any questioning of Rogers's competency in the performance of his duties simply would not carry over to taint the independent fingerprint expert's conclusion that the palm prints recovered from the post office counter on the day of the attempted robbery belonged to the Defendant. *Cf. United States v. Wilson*, 481 F.3d 475, 481 (7th Cir. 2007) ("Undisclosed impeachment evidence would not produce a different result if the testimony of the witness against whom it is offered was strongly corroborated by other evidence.").

Taking a different approach, the Defendant argues that Rogers's disciplinary record

8

would be admissible to show his bias. He argues that "Rogers knew he was on thin ice with the Fort Wayne Police Department due to his prior disciplinary record. Knowing that his career was in jeopardy automatically makes Rogers biased and prejudiced against the defendant." (Reply 4, ECF No. 94.) The Defendant's argument finds no support in the record. First, the evidence does not establish that Rogers would have had the suggested concerns about his job. His record leading up to the robbery and the trial is fairly unremarkable and benign. Nearly six years before he lifted prints in the post office, Rogers received a letter of reprimand for a car accident. The only other employment actions, another letter of reprimand and counseling, were even more removed in time from the performance of his duties in December 2012. Even if the Defendant had been able to establish that Rogers believed his career was in jeopardy, it does not follow that it would cause him to be biased against the Defendant, a person he did not even know. The evidence Rogers collected did not implicate the Defendant or anyone else until it was analyzed by a fingerprint expert. The only way to make sense of the Defendant's bias argument is if he also intended to prove to the jury that Rogers planted evidence at the scene and, for some reason, selected the Defendant as his target. Yet the Defendant does not explain how a reasonable response to believing one's job is at risk is to commit serious misconduct that would only increase the prospect of a negative employment consequence. The Defendant's bias argument is without merit.

The Court also notes that the fingerprint evidence did not stand alone as support for the jury's verdict. The jury saw video clips of the counter jumper and the placement of his hand on the middle counter, and heard testimony from witnesses who observed the counter jumper's location. A postal window clerk testified that she locked eyes with the counter jumper as he

9

entered the lobby area and began pulling his mask up. Later, when she was shown photographs of twelve individuals, she selected the Defendant as the person resembling the one she had locked eyes with. She testified that "[t]he only thing that was different about this picture that I remember seeing from his face in this picture, it makes his skin tone a lot darker than what I remember seeing at the door; it's just a shadow on this picture." (Trial Tr. Day 2 at 56–57.) The jury also learned that the Defendant's cell phone was left on the counter. Although the Defendant advanced the theory in closing that someone had stolen his phone and left it at the Post Office, the jury had not heard evidence to support the theory that he lost it anywhere but at the post office during the attempted robbery. Hanson testified that she called the Defendant's phone numerous times on the day of the robbery, and then when the Defendant got to her house, he also attempted to call his phone. This shows only that the Defendant did not know where his phone was after the robbery.

This case stands in stark contrast to *Smith v. Cain*, where the suppressed statements "directly contradict[ed]" the lone eyewitness's identification testimony at trial. 132 S. Ct. at 630. The Court found that these statements were material to the verdict because the eyewitness's "testimony was the *only* evidence linking [the defendant] to the crime." *Id.* "No other witnesses and no physical evidence implicated Smith in the crime." *Id.* at 629. Under these circumstances, the eyewitnesses "undisclosed statements were plainly material." *Id.* at 630. Here, the undisclosed material about Rogers does not directly contradict anything the jury heard during the trial. Additionally, Rogers's testimony was not the only evidence linking the Defendant to the crime. In consideration of these facts, and of Rogers's limited role in the investigation and, correspondingly, in the trial, the information could not reasonably be taken to put the entire case

in such a different light as to undermine confidence in the verdict. The Defendant is not entitled to a new trial on the grounds presented in his first Motion for New Trial.

**B.      Jury Instruction**

The Defendant argues that the jury instructions given at his trial included plain error that affected his substantial right to a jury trial, and that it is in the interest of justice to vacate the guilty verdicts as to all three counts and grant him a new trial. He contends that the jury instruction pertaining to the charge that he aided and abetted a violation of 18 U.S.C. § 924(c), particularly Jury Instruction No. 31, was plain error in light of the United States Supreme Court's recent opinion in *Rosemond v. United States*, 134 S. Ct. 1240 (2014). Although the jury instruction at issue pertains only to Count 2, the Defendant argues the guilty verdicts for all three counts should be vacated because his trial approach and strategy would have been significantly different based on the *Rosemond* decision. Because the Defendant did not object to this instruction at trial, any error is subject to plain error review under Federal Rule of Criminal Procedure 52(b). *See United States v. Olano*, 507 U.S. 725, 732–33 (1993) (discussing difference between waiver and forfeiture in context of appellate authority under Rule 52(b)).

In *Rosemond*, the Supreme Court set out to decide "what it takes to aid and abet a § 924(c) offense," addressing how the two general requirements for aiding and abetting liability—(1) an affirmative act in furtherance of the underlying crime and (2) intent to facilitate commission of the crime—apply with respect to a § 924(c) offense, a "combination crime" for which the Government must show both "the use or carriage of a gun" and "the commission of a predicate (violent or drug trafficking) offense." 134 S. Ct. at 1245, 1248. *Rosemond* arose from

11

"a drug deal gone bad" in which the "buyers-turned-robbers" fled the scene without paying for marijuana they received. *Id.* at 1243. As the getaway car sped away, one of its occupants fired shots from a semiautomatic handgun. Because the shooter's identity was disputed, the government charged Rosemond (one of the vehicle's occupants and the suspected shooter) with using a gun in furtherance of a drug trafficking offense or, in the alternative, with aiding and abetting that offense.

The *Rosemond* trial court instructed the jury on the general concept of aiding and abetting consistent with 18 U.S.C. § 2. The court then went on to address the essential elements of a charge of aiding and abetting in the context of a § 924(c) offense. *See* 134 S. Ct. at 1245. The *Rosemond* trial court instructed the jury that they could convict if "(1) the defendant knew his cohort used a firearm in the drug trafficking crime, and (2) the defendant knowingly and actively participated in the drug trafficking crime." *Id.* at 1244. Both the affirmative act and intent elements were at issue before the Supreme Court.

With respect to the affirmative act requirement of the offense, the Court rejected the defendant's argument "that the requisite act . . . must be directed at the use of the firearm," holding that a defendant can be convicted as an aider and abettor even if his aid "relates to only one (or some) of a crime's phases or elements." *Id.* at 1247 (internal quotation marks omitted). Under the Court's ruling, the affirmative act requirement for aiding and abetting a § 924(c) violation may be satisfied by showing that the defendant facilitated either the predicate offense (in *Rosemond*, a drug trafficking crime; here, a crime of violence) or the firearm use (or both). *Id.*

As to the intent requirement, however, the Court held that the trial court's instruction was

12

erroneous because it failed to require that Rosemond knew in advance that one of his cohorts would be armed. *Id.* at 1251–52. Instead, applying the given instruction, a defendant's mere knowledge that one of his or her cohorts used a firearm in the course of the drug trafficking crime, despite when that knowledge was gained, was sufficient evidence, of the requisite intent to aid and abet. The prosecutor in *Rosemond* had driven this point home in closing argument by telling the jury it could find the intent element of the aiding and abetting crime satisfied because "the fact is a person cannot be present and active at a drug deal when shots are fired and not know their cohort is using a gun. You simply can't do it." *Id.* at 1244. The Court reasoned that the defendant's "intent must go to the specific and entire crime charged," which in the context of § 924(c) means the "predicate crime plus gun use." *Id.* at 1248. A defendant has the requisite intent when he actively participates in the predicate offense knowing one of his confederates will carry a gun. *Id.* at 1249 (the "defendant's knowledge of a firearm must be advance knowledge—or otherwise said, knowledge that enables him to make the relevant legal (and indeed, moral) choice" to participate in an armed crime). If the accomplice knows nothing of the gun until it appears at the scene, it may be too late to quit the crime, or he may have already completed his acts of assistance. Thus, the *Rosemond* jury instruction was erroneous because it failed to explain that the defendant "needed advance knowledge of a firearm's presence" and thus permitted the jury to convict even if the defendant "first learned of the gun when it was fired and . . . took no further action to advance the crime." *Id.* at 1251–52.

The Defendant in this case was convicted of aiding and abetting another person with using a firearm during and in relation to the attempted robbery of a post office. Throughout the trial, the Defendant was referred to as the counter jumper, as distinguished from the man who

13

wielded the firearm. The Court instructed the jury that "[a]ny person who knowingly aids, counsels, commands, induces, or procures the commission of an offense may be found guilty of that offense if he knowingly participated in the criminal activity and tried to make it succeed." (Court's Instruction No. 20, ECF No. 64 at 21.) The jury was informed that the Defendant was charged in Count 2 of the Indictment with using a firearm during in relation to the crime charged in Count 1, or aiding and abetting the same, and instructed that the Government had to prove (1) that the Defendant committed the crime of attempted robbery, and (2) "knowingly used, carried, or brandished a firearm during and in relation to such crime." (Court's Instruction No. 30, ECF No. 64 at 31.) Then, Instruction No. 31 provided:

> A defendant aids, counsels, commands, induces, or procures the commission of the offense only if he knowingly and intentionally assists another's use or carrying of a firearm during and in relation to a crime of violence. This requires the government to prove the following beyond a reasonable doubt:
>
> 1. The defendant knew, either before or during the crime, of another person's use, carrying, or brandishing of a firearm; and,
>
> 2. The defendant intentionally facilitated the use, carrying, or brandishing of the firearm once so informed.
>
> A person who merely aids the underlying offense knowing that a firearm would be used, carried, or brandished does not aid, counsel, command, induce, or procure the commission of the offense charged in Count 2.
>
> If you find from your consideration of all the evidence that the government proved both of these elements beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all the evidence that the government failed to prove both of these elements beyond a reasonable doubt, then you should find the defendant not guilty.

(Court's Instruction No. 31, ECF No. 64 at 32.) The Defendant argues that this instruction is inconsistent with the *Rosemond* standard, and permitted the jury to convict him without finding an element of the offense.

*Rosemond* directs that jury instructions should convey, with regarding to intent in an aiding and abetting case, "that the defendant has chosen, with full knowledge, to participate in the illegal scheme," 134 S. Ct. at 1250, which extends "to the entire crime," *id.* at 1248. In *Rosemond*, the instruction telling the jury to consider merely whether the defendant "knew his cohort used a firearm" was misleading because it did not require that the defendant have the requisite intent to assist a crime involving a gun. Rather, the jury could convict even where the defendant's intent did not reach beyond a simple, unarmed drug sale, and he knew nothing of the gun until it appeared when the drug deal went bad.

Here, the Court's Instructions, taken as whole, did not allow the jury to convict the Defendant without concluding that he intended to participate in the armed robbery of the Post Office. Instruction No. 31 overstated the Government's burden with respect to the affirmative act in furtherance of the § 924(c) offense when it required that the Defendant intentionally facilitate the "use, carrying, or brandishing of the firearm" after he learned of its existence. The jury was informed, consistent with Seventh Circuit case law, that merely aiding "the underlying offense knowing that a firearm would be used, carried, or brandished" does not constitute aiding and abetting the commission of the § 924(c) offense. *See United States v. Andrews*, 442 F.3d 996, 1002 (7th Cir. 2006) (setting forth elements necessary to be held liable for a violation of 18 U.S.C. § 924(C) under an aiding and abetting theory). In actuality, as clarified by *Rosemond*, the law only requires that the Defendant's affirmative act further the underlying offense, as long as he also knew that the offense would involve a firearm. At the Defendant's trial, the requirement that the jury find that he "intentionally facilitated the use, carrying, or brandishing of the firearm once . . . informed" of the other's person's use, carrying, or brandishing logically requires that

15

the Defendant's participation (or continued participation) occurred after he knew of the gun's use. A person cannot facilitate the use of a firearm unless he has knowledge of the firearm. *See, e.g.*, *Andrews*, 442 F.3d at 1002 (stating that the standard created by the Seventh Circuit left the court with two questions: (1) whether a rationale trier of fact could have found that the defendant knew the men who borrowed his car to rob the credit union possessed a weapon; and (2) whether a rationale trier of fact could have found that the defendant facilitated the use, carrying, or possession of the weapon after he was informed of its existence). Although it would be possible for a jury to convict a defendant under the Court's instructions if he knew "either before *or during the crime*" that the principal would possess or use a firearm, he nevertheless had to obtain the knowledge at a time when he still had an opportunity to intentionally facilitate the use, carrying, or brandishing of the firearm, and thus in time to enable him to make the relevant legal and moral choice to participate in an armed crime. In other words, overstating the burden on the affirmative act element impacted the intent element, and conveyed that advance knowledge was necessary to find the Defendant guilty.

The Court acknowledges that the instructions could potentially permit a conviction under the scenario where a defendant learned of the principal's use of a firearm during the commission of a crime and intentionally facilitates that use, but did so *only* because the late timing of the knowledge did not allow an opportunity to back out. But even if the instruction amounted to plain error under *Rosemond*, the Defendant has not carried his burden of showing a reasonable probability that the error affected the outcome of his trial. *See United States v. Marcus*, 560 U.S. 258, 262 (2010) (citing *United States v. Olano*, 507 U.S. 725, 734–35 (1992)); *United States v. Westmoreland*, 240 F.3d 618, 634 (7th Cir. 2001) (noting that an error only affects substantial

16

rights if it "affected the outcome of the district court proceedings"). The Defendant's conviction arose out of facts strikingly different from the scenario present in *Rosemond*. The evidence presented at trial was that the Defendant and his accomplice entered the Post Office in quick succession, pulling nylon masks up over their noses. The Defendant's accomplice immediately warned customer Dawn Hunter that he had a gun, which he then aimed at her stomach. He told her to back up into a corner area created by the customer service counters and the wall. She testified that the Defendant himself then joined the man holding the gun and reached into her purse to remove a card holder and change purse, which he threw back into her purse. The surveillance video leaves no question regarding the proximity of the three individuals. The Defendant is not then seen to leave the Post Office. Instead, while the accomplice stayed with Hunter, who was the only other person in the post office lobby, the Defendant jumped over the counter, looked for items to take, vaulted back over, and fled with his accomplice. Even though the gun is not readily visible in the time lapsed video surveillance (the accomplice is facing Hunt with his hand held lower than counter level, which obstructed the view), the jury believed Hunt's testimony concerning the gun. The surveillance video and Hunt's 911 call confirm all the other details surrounding her telling of the events. The Government's closing arguments on the topic was that the two men planned for one of them to carry a firearm and neutralize any people in the Post Office so that the other could be free to locate and take the items they planned to steal. Based on the facts presented to the jury, its verdict on Count 2 can only be understood as a determination that the Defendant intended to assist in an *armed* robbery.

The Court finds that the § 924(c) aiding and abetting jury instruction did not affect the Defendant's substantial rights, and that he is not entitled to a new trial.

**CONCLUSION**

For the foregoing reasons, the Defendant's First Motion for New Trial Pursuant to Fed. R. Crim. P. 33 [ECF No. 83] and Second Motion for New Trial Pursuant to Fed. R. Crim. P. 33 [ECF No. 95] are DENIED. The Court GRANTS the Defendant's Motion to Continue Presentencing Motion/Memorandum Deadline [ECF No. 84]. The Court will schedule this matter for sentencing by separate order.

SO ORDERED on August 26, 2014.

                                          s/ Theresa L. Springmann
                                          THERESA L. SPRINGMANN
                                          UNITED STATES DISTRICT COURT